## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### Orlando Division

**JUAN FERNANDO TEJADA,**

   **Plaintiff,**

v.            **CIVIL ACTION NO. _____**

**CITIBANK, N.A.;**
**EQUIFAX INFORMATION**
**SERVICES, LLC; EXPERIAN**
**INFORMATION SOLUTIONS, INC.;**
**and TRANS UNION, LLC,**

   **Defendants.**

### COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, **JUAN FERNANDO TEJADA**, by and through his undersigned counsel, alleges the following against Defendants CITIBANK, N.A. ("Citibank"), EQUIFAX INFORMATION SERVICES, LLC ("Equifax"), EXPERIAN INFORMATION SOLUTIONS, INC. ("Experian"), and TRANS UNION, LLC.

### PRELIMINARY STATEMENT

1. This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees brought pursuant to the Fair Credit Reporting Act ("FCRA") 15 U.S.C. §§ 1681a-x.

2. In this case, Defendants erroneously published inaccurate and derogatory information within Plaintiff's credit reports and when Plaintiff disputed the information, Defendants failed to correct the inaccurate information they were reporting in his credit files.

3.     Today in America there are three major consumer reporting agencies, Equifax Information Services, LLC, Experian Information Solutions, Inc., and Trans Union, LLC.

4.     The FCRA demands of reporting agencies like Equifax, Experian, and Trans Union (together, the "CRA Defendants") that they utilize reasonable procedures to assure the maximum possible accuracy of the information they report. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

3.     Consumer reporting agencies ("CRAs") that create consumer reports, like the CRA Defendants, are charged with using reasonable procedures designed to ensure the maximum possible accuracy of the information they report. It is not enough for them to simply parrot information they receive from entities like Citibank, particularly where a consumer makes a dispute about information reported.

4.     Also, when a consumer like Plaintiff disputes the accuracy of information through the agencies, those disputes are transmitted to the party furnishing the information, here Citibank. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete information they learn to be inaccurate or cannot otherwise verify.

5.     Plaintiff brings claims under FCRA Section 1681e(b) against these

CRAs because they reported about Plaintiff inaccurate information regarding a Citibank account that does not belong to Plaintiff. When Plaintiff disputed the inaccuracies, the agencies did not reasonably investigate, also violating Section 1681i.

6.     The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy." Consumer Fin. Prot. Bureau, SUPERVISORY HIGHLIGHTS CONSUMER REPORTING SPECIAL EDITION 21 (Issue 14, March 2, 2017).  This is particularlytrue as to how the CRA Defendants have complied with their now 50-year-old obligation to conduct a meaningful accuracy investigation. The CRA Defendants have been repeatedly sued byconsumers, sanctioned by regulators and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct. Had they followed that advice and heeded those warnings, the Plaintiff would not have been harmed.

7.     Likewise, Citibank violated the FCRA, Section 1681s-2(b), when it received Plaintiff's disputes from the agencies and failed to reasonably investigate those disputes. Instead, discovery will show all Citibank did was consult its own records about the disputed account and confirm to the agencies the inaccurate information it was already reporting. Citibank also violated the FCRA, Section 1681b(f)(1) when it unlawfully obtained the Plaintiff's consumer reports without his written authorization or for any permissible purpose under the Act.

## JURISDICTION AND VENUE

8.      The jurisdiction of this Court is conferred by 15 U.S.C. § 1681p.

9.      Venue is proper in this District and Division because the Plaintiff is a resident of this District and each of the Defendants transacts business within this District and Division.

## PARTIES

10.     Plaintiff Juan Fernando Tejada is a natural person and "consumer" as defined by § 1681a(c).

11.     Citibank, N.A. is a national bank and credit lender doing business in the State of Florida.

12.     Citibank, N.A. is a "furnisher' of information as defined and governed by 15 U.S.C. § 1681s-2 and case law interpreting that Section.

13.     Defendant Equifax Information Services, LLC ("Equifax") is headquartered in Georgia and does business in the State of Florida  through its registered agent.

14.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

15.     Defendant Experian Information Solutions, Inc. is headquartered in California and does business in the State of Florida  through its registered agent.

16.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

17.     Defendant Trans Union LLC is headquartered in Illinois and does business in the State of Florida through its registered agent.

18.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f), and it disburses consumer reports to third parties for monetary compensation.

## FACTUAL ALLEGATIONS

### Sections 1681e(b) and 1681i(a) of The Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the CRA Defendants' Creditor-Customers

19.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. *See* S. Rep. No. 91–517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); *id.* at 36570 (statement of Rep. Sullivan); . . . . In enacting FCRA Congress adopted a variety of measures designed to insure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

20.     "Section 1681e(b) sets forth the CRAs' overall du[t]y:

> (b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke*, 2011 WL 1085874, at *4.

21.   "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329,  1333 (9th Cir. 1995) (citations omitted). "'These consumer oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond*, 45 F.3d at 1333).

22.   Over a decade ago, the Third Circuit apprised Trans Union of the high duty of care imposed by Section 1681e(b):

> [T]he distinction between "accuracy" and "maximum possible accuracy" is not nearly as subtle as may at first appear, it is in fact quite dramatic....
>
> There are, of course, inherent dangers in including any information in a credit report that a credit reporting agency cannot confirm is related to a particular consumer. Such information is nearly always "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for ... credit." 15 U.S.C. § 1681a(d)(1). Allowing a credit agency to include misleading information as cavalierly as Trans Union did here negates the protections Congress was trying to afford consumers and lending institutions involved in credit transactions when it enacted the FCRA....
>
> Congress surely did not intentionally weave an exception into the

> fabric of the FCRA that would destroy its remedial scheme by allowing a credit reporting agency to escape responsibility for its carelessness whenever misleading information finds its way into a credit report through the agency of a third party....
>
> Trans Union remains responsible for the accuracy in its reports under the FCRA and it cannot escape that responsibility as easily as it suggests here. Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer, and the record clearly supports the jury's determination that Trans Union did not exercise sufficient care here.

*Cortez v. Trans Union, LLC*, 617 F.3d 688, 709–10 (3d Cir. 2010).

23.    Section 1681i(a), on the other, hand requires much more from a CRA

after a consumer has placed it on notice of an inaccuracy through his dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C. § 1681i(a)(1)(A).

24.    Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

25.    It has long been the law that a CRA, such as Equifax, Experian, or Trans Union, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item.  *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015); *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-cv-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515-TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.").

26.    That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

27.    As the Fourth Circuit explained in *Johnson v. MBNA*:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

357 F.3d 426, 430 (4th Cir. 2004).

28.    Further, as the CRA Defendants are aware, this Court has held that even though the term "investigation" is not used in § 1681e(b), it is clear that Defendants have a duty to conduct a reasonable initial investigation pursuant to § 1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable procedures" that (2) "assure" (3) "maximum possible accuracy." To "assure" means "to make sure or certain: put beyond all doubt." *Webster's Third New International Dictionary* 133 (1993). "Maximum" means the "greatest in quantity or highest degree attainable" and "possible" means something "falling within the bounds of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It is difficult to imagine how "maximum possible accuracy" could be guaranteed without an adequate investigation. Likewise, Section 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that an "investigation" was required to have been performed in the first instance.

*Burke*, 2011 WL 1085874, at *4.

29.    It has long been the law – since 1970 in fact – that:

> [W]hen a CRA learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise), it must review its procedures for assuring accuracy and take any necessary steps to avoid future problems. Similarly, it should establish procedures to avoid reporting

> information from its furnishers that appears implausible or
> inconsistent.

Fed. Tr. Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT

(July 2011), at 67.[1]

30.   Today, furnishers such as Citibank and other of the CRA Defendants'

furnishers, have their own independent duties under the FCRA, principally those

found at 15 U.S.C. § 1681s-2.   But while the CRA Defendants' duties under §

1681e(b) were enacted in 1970 and have governed since, the duties on furnishers

are much recent, enacted on in 1996. THE CONSUMER CREDIT REPORTING REFORM

ACT OF 1996, Pub. L. No. 104-208 (1996).

### Plaintiff Discovers the CRA Defendants Were Inaccurately Reporting a Citibank "Mixed File" Account that Does Not Belong to Him and Disputes Those Inaccuracies

31.   Defendants mixed the credit files of Plaintiff and another person.

32.   On or about October 24, 2022, Plaintiff received an email notification

from Citibank that a loan application had been approved.

33.   That same day, Plaintiff called Citibank's loan department to dispute

that he had submitted any recent loan application.

34.   On or about November 1, 2022, Plaintiff discovered the disputed loan

(for $15,000) was reporting on his Citibank account.

---

[1]   *Available at*  https://www.ftc.gov/sites/default/files/documents/reports/40–years–experience–
fair–credit–reporting–act–ftc–staff–report–summary–interpretations/110720fcrareport.pdf.

35. Between November 1, 2022 and February 2023, Plaintiff would submit numerous disputes, requests to open fraud investigations, and "presidential" complaints to Citibank through various employees to challenge the account as belonging to him. Plaintiff engaged in significant communications both over the phone and in-person at multiple branches.

36. Plaintiff eventually learned between November and December 2022, through Citibank's employees, that the $15,000 loan was the result of a bank error as another Citibank client with the same name as or similar name to Plaintiff went to open a loan with Citibank and the banker mistakenly selected Plaintiff's profile when originating the loan. Yet, Citibank had by then conducted a hard pull of Plaintiff's credit reports from Equifax, Experian, and Trans Union and was reporting the account as delinquent on Plaintiff's credit files.

37. Indeed, on or about December 24, 2022, Plaintiff received an alert that one of his credit scores had decreased by over 100 points as a result of the delinquency status of the disputed Citibank loan.

38. Plaintiff's January 16, 2023 credit reports from the CRA Defendants showed that each of them were inaccurately reporting the disputed Citibank account as belonging to him and 30 days or more past due. The January 16, 2023 report from Equifax confirmed a hard inquiry by Citibank on October 24, 2022; and the January 16, 2023 report from Experian confirmed two hard inquiries by Citibank on November 1, 2022.

39. Despite Plaintiff's ongoing efforts throughout November 2022, December 2022, and January 2023, Plaintiff would not receive a letter from Citibank until February 2, 2023, more than three months after the account was wrongfully originated and Plaintiff's credit scores plummeted, which stated: "We understand you were made aware of a Citibank loan in the amount of $15,000.00 in your name that you did not apply for or request. Upon review, it appears the loan was opened on November 1, 2022, in error…"

### *Plaintiff Disputes the Inaccuracies with the CRA Defendants*

40. In or around early January, Plaintiff disputed the Citibank loan as not his account with Trans Union.

41. In or around early January 2023, Plaintiff submitted a dispute to Equifax to dispute: (i) the Citibank loan as not his account; and (ii) the October 2022 hard inquiry from Citibank as not permissible.

42. On January 6, 2023, Equifax forwarded to Plaintiff the results of its reinvestigation, in which it refused to remove the hard inquiry obtained by Citibank without a permissible purpose.

43. On January 10, 2023, Equifax forwarded to Plaintiff the results of its reinvestigation, in which it refused to remove the hard inquiry obtained by Citibank without a permissible purpose.

44.     On January 10, 2023, Trans Union forwarded to Plaintiff the results of its reinvestigation, in which it verified the disputed Citibank loan as belonging to Plaintiff and reported the account with a "Pay Status" of "30 Days Past Due Date[.]"

45.     On January 11, 2023, Equifax forwarded to Plaintiff the results of its reinvestigation, in which it verified the disputed Citibank loan account as belonging to Plaintiff and reported the account as 30-59 days past due.

46.     On or about February 1, 2023, Plaintiff submitted written disputes via Certified Mail to Equifax and Experian to dispute the Citibank loan as not his account. Plaintiff's disputes were signed before a Notary Public and included a copy of his identification.

47.     On February 7, 2023, Experian forwarded its investigation results to Plaintiff and verified the disputed Citibank account as accurate. Equifax continued to report the Citibank account as belonging to Plaintiff and past due.

48.     On February 8, 2023, Equifax forwarded correspondence to Plaintiff refusing to conduct an investigation into Plaintiff's dispute letter unless Plaintiff provided proofs of his identity from two separate categories, despite Plaintiff having already provided a copy of his identification with his dispute.

49.     On March 3, 2023, Plaintiff sent Equifax via Certified Mail additional proof of his identity as requested.

50.     Upon information and belief, Equifax never conducted a reinvestigation of Plaintiff's February 1, 2023 dispute, or in the alternative, Equifax failed to forward to Plaintiff the results of its reinvestigation.

51.     Defendants had actual knowledge of these inaccuracies and deliberately chose to ignore and permit the reporting of the disputed and derogatory Citibank account.

52.     Upon information and belief, Plaintiff alleges that on one or more occasions the CRA Defendants forwarded Plaintiff's disputes to Citibank. Upon information and belief, Citibank was provided notice of Plaintiff's disputes, and, despite this notice, failed and refused to investigate and correct its inaccurate reporting.

53.     The CRA Defendants each received the Plaintiff's multiple disputes, but in many cases wholly and entirely failed to conduct the reinvestigations required by law.  Instead, the CRA Defendants merely "parroted" the information dictated to it Citibank.

54.     Upon information and belief, the CRA Defendants prepared and published to third parties multiple inaccurate consumer reports about Plaintiff that reflected the inaccurate, derogatory Citibank account that does not belong to Plaintiff.

### *Plaintiff Discovers that Equifax and Experian were reporting unauthorized and impermissible Credit Inquiries*

55.     Likewise in January 2023, when Plaintiff reviewed his Experian and Equifax reports he noticed that Citibank, N.A. had in October and November 2022 accessed his credit reports and conducted a "hard inquiry" without his permission.

56.     Plaintiff had never authorized Citibank to conduct a hard inquiry of his credit in the October-November 2022 timeframe.

57.     Plaintiff likewise never received any the benefit of the $15,000 loan Citibank wrongfully attached to Plaintiff's credit files.

58.     Accessing Consumer Reports is presumptively illegal.  To overcome this presumption, a party seeking to access consumer reports must have a permissible purpose for doing so and must certify to the agency from which it seeks reports the FCRA purpose for which it will use the reports and that it will use the reports for no other purpose. 15 U.S.C. § 1681b(f).

59.     One such permissible purpose is "in accordance with the written instructions of the consumer to whom it relates." 15 U.S.C. § 1681b(a)(2).

60.     Another potential purpose that arises in the credit realm is for is for reports to issue "[t]o a person which [the reporting agency] has reason to believe— A intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." *Id.* § 1681b(a)(3)(A).

61.     Lastly, reports for credit transactions may issue "[t]o a person which [the reporting agency] has reason to believe—(F) otherwise has a legitimate

business need for the information—(i) in connection with a business transaction that is initiated by the consumer." *Id.* § 1681(a)(3)(F)(i).

62.     Whatever the purpose, Citibank was required to certify to any reporting agency from whom it obtained reports about Plaintiff one of these purposes.  Discovery will show Citibank did so certify, but that certification was false because (1) Plaintiff never instructed Citibank, in writing or otherwise, to obtain his credit report or access his credit information in October/November 2022; (2) Plaintiff never agreed to open a $15,000 loan account with Citibank in October/November 2022; and (3) Plaintiff never initiated a loan application with Citibank in October/November 2022.

63.     Whatever Citibank may have certified to Equifax and Experian, it had no legitimate use for Plaintiff's credit information.

64.     Instead, discovery will show, Citibank either falsified its certifications or, alternatively, sought Plaintiff's credit information for an impermissible purpose.

### The CRA Defendants Did Not and Do Not Conduct Any Investigation of Most Consumer Disputes

65.     Unknown to the Plaintiff until this lawsuit, it has long been the practice of the CRA Defendants to refuse to perform that statutorily-mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendor located overseas. Both Equifax and Trans Union use the same vendor, previously known as Intelenet Global Services

and now as Teleperformance. Experian uses a sister company, Experian Chile (or Experian Costa Rica) to process its mailed disputes.

66.     These dispute processing vendors are not hired to perform an actual FCRA investigation.  Instead, the vendors' sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

67.     In fact, the CRA Defendants strongly encourage consumers to make disputes through their online websites.  When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "Not my account.").  The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax, Experian, or Trans Union. It gets sent to the CRA Defendants' creditor customers (such as Citibank) for their sole review and consideration.

68.     Here is how the written mail dispute process actually works: for Equifax, a third-party document processing company in Atlanta maintains several Post Office boxes for receiving consumer mail to Equifax such as disputes, requests for a credit file disclosure or other communication.  That mailbox company receives consumer disputes, scans them into a batch of other disputes.

69.     Trans Union, on the other hand, receives and scans the mail into batches directly out of its facility in Eastern Pennsylvania.

70.     Both Equifax and Trans Union then forward the dispute mail batches to the same third-party vendor, Teleperformance, based in Mumbai, India.

Teleperformance uses low-wage employees to work quickly to process the consumer dispute letters received from the Atlanta-based mail company, skimming the letters and selecting one of a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits. For example, the most common relevant code is: "01 Not his/her."

71.     Teleperformance and Experian Chile agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

72.     Equifax and Trans Union have taken the position in other litigation that it has no control over the Teleperformance agents. For example, under oath before another court in recent time, Equifax's representative employee testified: "Intelenet has no corporate affiliation with Equifax. Intelenet is not a corporate partner of Equifax. Rather, Intelenet is a company wholly separate from Equifax and is a party to a contract with Equifax wherein Equifax hired Intelenet to assist Equifax with various matters. Neither Mr. Negi nor Mr. Singh [the dispute processing agents] are employees of Equifax." *Miller v. Equifax Info. Serv.*, Case No. 4:19-cv-584, ECF 47-1 (M.D. Fl. Sept. 18, 2020). And in its briefing in that same case, Equifax argued, "Courts have determined that Intelenet is a separate legal entity, not controlled by a party."

73.     Trans Union has taken and succeeded with this same position. *See, e,g.*, *Wilcox v. Servis One, Inc.*, No. 1:19-cv-02545-RDB (D. Md.), ECF 71 (ruling

that Trans Union did not have control or the ability to produce for deposition Indian employees of Intelenet).[2]

74.    Regardless of whether these statements are correct, the CRA Defendants believe that they cannot direct, control, manage or reliably influence the employees of their respective third-party outsource vendors.

75.    The CRA Defendants themselves did not conduct any reinvestigation of Plaintiff's many disputes.  Instead, they merely caused them to be removed from their control to be saved within a database by an overseas data-processing vendor.

### The CRA Defendants Forwarded
### Plaintiff's Disputes to Citibank, Who Did Nothing

76.    In each instance in which Plaintiff disputed the Citibank account with the CRA Defendants, the CRA Defendants forwarded Plaintiff's disputes to Citibank using an electronic system called "e-Oscar," which is an industry-wide process by which such disputes are electronically communicated to furnishers and dispute results back to CRAs.

---

[2] Defendant Experian took a different route, outsourcing its dispute procedures to an affiliated company, Experian Services Chile, S.A, in Santiago, Chile. Experian long ago lost the argument that testimony from these dispute agents requires more than a garden-variety Rule 30 notice. *Calderon v. Experian Info. Sols., Inc.*, 290 F.R.D. 508, 510 (D. Idaho 2013). Such was confirmed in a recent case in this District with Plaintiff's Counsel opposing, wherein Experian produced its Chilean dispute investigator for remote deposition through a Rule 30(b)(1) notice without opposition. *Sublett v. Nissan of Richmond, LLC, et al.*, No. 3:20-cv-156 (E.D. Va.).

To the extent Experian would reverse course from *Sublett* and argue here that it cannot produce its Chilean dispute agents pursuant to a Rule 30 notice, then Plaintiff will pursue her 1681i failure-to-investigate claim on the same theory—no investigation was conducted by the CRA—as she alleges against Trans Union for its farming-out of investigations to Teleperformance.

77.     e-Oscar is also the system by which Citibank has agreed it will accept such consumer disputes from the CRAs.

78.     Under such circumstances, Citibank became obligated under the FCRA to investigate Plaintiff's disputes.

79.     Plaintiff's disputes to Citibank to attempt to have it reinvestigate his complaints went unanswered, as Citibank verified the disputed, derogatory loan account as belonging to Plaintiff.

80.     Citibank failed to reinvestigate Plaintiff's complaints.

81.     Discovery will show that all Citibank did when supposedly investigating Plaintiff's disputes was consult its own internal account records and simply report back to the CRAs the same inaccurate information Plaintiff was disputing.

82.     The information furnished by Citibank to the CRA Defendants was at all times inaccurate.

83.     On or about a date better known to Equifax and Citibank, Equifax furnished Plaintiff's disputes to Citibank.

84.     On or about a date better known to Experian and Citibank, Experian furnished Plaintiff's disputes to Citibank.

85.     On or about a date better known to Trans Union and Citibank, Trans Union furnished Plaintiff's disputes to Citibank.

86.     Citibank failed to reasonably reinvestigate Plaintiff's disputes that Citibank received from the CRA Defendants in violation of § 1681s-2(b)(1)(A) of the FCRA.

87.     Defendant Citibank further violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to delete the disputed Citibank account after receiving Plaintiff's disputes from the CRA Defendants and prior to the commencement of this action.

88.     The CRA Defendants responded to Plaintiff's disputes, claiming the information was reported verified as accurate and the information was updated. This response confirms that the CRA Defendants communicated Plaintiff's disputes to Citibank.

89.     Upon information and belief, Equifax timely notified Citibank of Plaintiff's February 2023 dispute, via e-OSCAR or otherwise, and provided the supporting documents with Plaintiff's February 2023 dispute.

90.     Alternatively, Equifax failed to notify Citibank of Plaintiff's February 2023 dispute, and/or failed to provide the supporting documents submitted with Plaintiff's February 2023 dispute.

91.     By its actions as described herein, Citibank furnished communicated false credit information in an attempt to oppress and harass Plaintiff into paying more money that what Plaintiff actually owed.

### *Plaintiff Suffered Actual Harm*

92.    Defendants continued to report the derogatory, disputed Citibank account on the Plaintiff's credit reports, despite being notified that this information was false and the account did not belong to Plaintiff.

93.    Plaintiff has been attempting to resolve these matters with Defendants and his credit was significantly destroyed by Defendants' failure to correct the inaccurate reporting.

94.    As a result of the inaccurate credit reporting, Plaintiff has suffered damages, including, but not limited to:

    a.  Damage to his credit scores;

    b.  Monies lost by attempting to fix his credit, e.g. communication costs, postage for disputes;

    c.  Loss of time attempting to cure the error, e.g. sending numerous disputes to Defendants;

    d.  Mental anguish, stress, aggravation, and other related impairments to the enjoyment of life;

    e.  Withdrawal from the credit marketplace and delay in obtaining a mortgage loan for fear of credit denials and/or adverse credit terms; and

    f.  Stress associated with attempting to resolve this matter in the last year.

### *Defendants' Conduct Was Willful*

95.     The FCRA allows for a remedy for a "willful" violation.  A willful act or violation includes, "not only knowing violations of [the statute], but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007).  A "reckless" action includes conduct whereby "the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

96.     Proof of willfulness includes, for example, "evidence that other consumers have lodged complaints similar to" the one made by the Plaintiff and a failure to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

97.     As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years.  The language of § 1681e(b) has not changed.  The CRA Defendants' dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Defendants' "grave responsibilities" to ensure accuracy has not changed.

98.     The CRA Defendants have received many thousands of disputes and other complaints regarding the creditors at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

99.     Just in federal court alone, during the last decade Citibank has had to defend over 600 consumer credit lawsuits.

100.   In many or even most of these FCRA lawsuits brought by a consumer, one or more of the CRA Defendants was a named co-defendant.

101.   The CRA Defendants knew or should have known of this litigation history.  They use and have access to PACER to investigate and monitor such consumer complaints.

102.   The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the Defendants, and/or to other government agencies, attorneys, or non-profit organizations.

103.   Each Defendant regularly receives unredacted consumer dispute details from this database.

104.   Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Equifax.

105.   Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Experian.

106.   Since the database began accepting complaints in 2017, the CFPB has sent hundreds of thousands of consumer credit reporting complaints to Trans Union.

107.   Further, over 35,000 of the CFPB complaints against Equifax, more than 33,000 complaints as to Experian, and just shy of 38,000 against Trans

Union were based largely on their failure to reasonably investigate consumer disputes.

108.   Further, consumers have submitted complaints about Citibank to the CFPB regarding its credit reporting. For example, Citibank has had over 9,000 CFPB complaints regarding its credit reporting.

109.   Just in the last 12 months alone, Equifax, Experian, and Trans Union have each been sued on by consumers alleging their violation of the FCRA over 2,000 times.  Most of these alleged that the Defendant violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute.  This complaint history has been true for nearly every year over the last decade.

110.   While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Defendants on notice of the failures of their dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed the CRA Defendants on notice that they may not merely "parrot" what their creditor-customer tells them if the consumer had provided a substantive and detailed dispute.

111.   Experian and Equifax have had actual notice from numerous other courts that their blind ACDV "parroting" was unlawful. *See, e.g.*, *Centuori v. Experian Info. Sols., Inc.*, 431 F. Supp. 2d 1002, 1008 (D. Ariz. 2006) ("'The grave responsibility imposed by [the FCRA] must consist of something more than merely parroting information received from other sources.'"); *Schweitzer v. Equifax Info. Sols. LLC*, 441 F. App'x 896, 904 (3d Cir. 2011); *Pourfard v. Equifax Info. Sols.*

*LLC*, 2010 WL 55446 (D. Or. Jan. 7, 2010) ("[T]he caselaw is clear that a reporting agency does not act reasonably under the FCRA by deferring entirely to another source of information."); *Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073–74 (D. Or. 2011) ("[Equifax] instead utilized an automated dispute system to verify the accuracy of plaintiffs' account. Many courts, including this one, have concluded that where a CRA is affirmatively on notice information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation.").

112.    Equifax has even been warned by one of its home state District Courts, the Southern District of Georgia, which detailed:

> Equifax argues that the creditor is the party responsible for investigating the dispute, once notified of it by the reporting agency. 15 U.S.C.A. § 1681s-2(b) (1998). According to Equifax, the reporting agency's duty under § 1681i is fulfilled once it forwards the complaint to the creditor, the entity in the best position to undertake an accurate investigation. Under § 1681s-2(b), furnishers of information, such as creditors, have certain duties to investigate consumers' disputes. Yet, this does not end the inquiry, or establish that the reporting agency has no responsibility beyond serving as a conduit for consumers' complaints.
>
> To the contrary, a credit reporting agency does not conduct a reasonable investigation by deferring entirely to another source of information. "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293. The FCRA "places the burden of investigation squarely on" the reporting agency. *Id.; see also Henson v. CSC Credit Servs.,* 29 F.3d 280, 286-87 (7th Cir. 1994); *Swoager v. Credit Bureau*, 608 F.Supp. 972, 976 (M.D. Fla. 1985).

*Sampson v. Equifax Info. Servs., LLC*, No. CIV.A. CV204-187, 2005 WL 2095092, at *5 (S.D. Ga. Aug. 29, 2005).

113.   Trans Union has long been on even clearer notice. The seminal Circuit Court decision addressing § 1681i(a) and finding that a CRA does not conduct a reasonable reinvestigation of a consumer's substantive dispute if it merely "parrots" its creditor-customer was a Trans Union case. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997).  Trans Union's notice was so substantial that one District Court instructed the jury in a § 1681i(a) trial:

> In assessing the issue of notice to Trans Union, you are instructed that, on several occasions since 1997, decisions of federal courts have informed . . . that the Fair Credit Reporting Act's Requirement for a reasonable reinvestigation must consist of something more than simply the parroting of information received from other sources and/or that a credit reporting agency does not act reasonably by deferring entirely to another source of information, such as a creditor.

*Mullins v. Equifax Info. Servs., LLC*, No. CIV. 3:05-cv-888 (E.D. Va. Aug. 27, 2007).

114.   Defendants have also been repeatedly criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive reinvestigations.

115.   In 2015, a large group of state Attorneys General forced a consent order from the CRA Defendants by which they were required to develop procedures necessary to comply with the FCRA.[3] The AG Settlement required

---

[3] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-Releases/Consumer-Protection/2015-05-20-CRAs-AVC.aspx.

amongst many changes and mandates that the CRA Defendants comply with § 1681i(a).

116.   The AG Settlement also required the CRA Defendants to conduct significant research and data gathering—even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case.   Notwithstanding these requirements, the Defendants did not meaningfully comply with the AG Settlement in these regards.

117.   Defendants are also aware of substantive and detailed criticism by public interest groups about their automated dispute system.   For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Defendants when a consumer makes a dispute.   That report was updated in 2019.   AUTOMATED INJUSTICE REDUX *Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors*, National Consumer Law Center, February 2019. ("NCLC Report").[4]

118.   The NCLC Report summarized its context:

> Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and TransUnion), and started the difficult task of compelling them to reform their

---

[4] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

119.   Among many of the CRA Defendants' accuracy failures, the NCLC

Report discovered:

- **Insufficient Information Conveyed and Considered in Investigation**. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

- **Failure to Transmit Information Submitted by the Consumer**. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

- **Perfunctory Credit Bureau Investigations**. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two or three digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- **Credit Bureaus Always Side with Furnishers**. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

120.   Despite the notice and judicial, regulatory and public interest criticism, Defendants have refused to change their dispute investigation process because it would cost too much money to do so.

121.   Defendants' procedures imposed on the Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

### CLAIMS FOR RELIEF

### COUNT I
### Violation of § 1681e(b) of the FCRA - against Equifax, Experian, and Trans Union

122.   Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

123.   Defendants Equifax, Experian, and Trans Union willfully violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer report and consumer files they published and maintained concerning the Plaintiff.

124.   As a result of this conduct, action and inaction of Equifax, Experian, and Trans Union, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

125.   Further, after the Plaintiff's disputes put them on notice of likely

inaccuracies and reasons to doubt the correctness of the reporting of their creditor-customers, Equifax, Experian, and Trans Union ignored such information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of the Plaintiff's credit reports.

126.     Each Defendant furnished multiple consumer reports to third parties containing the inaccurate tradeline information involving the disputed Citibank account and each Defendant did so after receiving notice of these inaccuracies.

127.     Equifax, Experian, and Trans Union's conduct, action and inaction was willful, rendering them liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

128.     As a result of Equifax, Experian, and Trans Union's violations of 15 U.S.C. § 1681e(b), the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n. Plaintiff does not seek joint liability.

129.     The Plaintiff is entitled to recover his costs and attorney's fees from Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**Violation of § 1681i of the FCRA - against Equifax, Experian, and Trans Union**

130.     Plaintiff realleges and incorporates all other factual allegations set forth in the Complaint.

131.     Equifax, Experian, and Trans Union willfully violated 15 U.S.C. §

1681i by failing to delete inaccurate information in the Plaintiff's consumer file after receiving actual notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to forward all relevant information to Plaintiff's creditors and/or creditors' attorneys; by failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit file; and by relying upon verification from a source it has reason to know is unreliable.

132.    Further, Equifax, Experian, and Trans Union violated Section 1681i by conducting ***no investigation at all***. Section 1681i demands that when Plaintiff notified each CRA directly of his disputes, that party-the consumer reporting agency who received the disputes-must investigate those disputes. The statute does not contemplate someone other than Equifax, Experian, or Trans Union conducting the investigation.

133.    Yet, Equifax and Trans Union used an unrelated third party, Teleperformance, over which Equifax and Trans Union have no control, to conduct their investigations. Teleperformance is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed. Equifax and Trans Union therefore violated 1681i on this basis because it sent Plaintiff's disputes away to a company that was not their controlled agent rather than investigating them as required.

134.    Furthermore, Experian used an unrelated third party, Experian Chile, over which Experian has no direct control, to conduct its investigations. Experian Chile is not, in the words of the statute, "the [consumer reporting]

agency" to whom Plaintiff disputed. Experian therefore violated 1681i on this basis because it sent Plaintiff's disputes away to acompany that was not its controlled agent rather than investigating them as required.

135.    As a result of Defendants' violations of 15 U.S.C. § 1681i, the Plaintiff is entitled to recover his actual damages pursuant to 15 U.S.C. § 1681n and/or § 1681o, or in the alternative his statutory damages of $1,000 pursuant to 15 U.S.C. § 1681n. Plaintiff does not seek joint liability.

136.    Defendants' conduct, action, and inaction was willful, rendering each Defendant liable for actual or statutory damages, and punitive damages in an amount to be determined by theCourt pursuant to 15 U.S.C. § 1681n.

137.    The Plaintiff is entitled to recover his costs and attorneys' fees from Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**Violation of § 1681s-2(b)(1)(A) of the FCRA – against Citibank**

138.    The Plaintiff realleges and incorporates the foregoing paragraphs above as if fully set out herein.

139.    Defendant Citibank violated 15 U.S.C. § 1681s-2(b)(1)(A) by failing to fully conduct a reasonable investigation of the Plaintiff's disputes after said disputes were furnished directly to it by Equifax, Experian, and Trans Union.

140.    As a result of this conduct, action and inaction of Citibank, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, the mental and emotional pain and

33

anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

141.    Citibank's conduct, action and inaction was willful and it is liable for actual or statutory damages and punitive damages in an amount to be determined by the Court, pursuant to 15 U.S.C. § 1681n. Plaintiff does not seek joint liability.

142.    The Plaintiff is entitled to recover his costs and attorneys' fees from Citibank in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT IV
## Violation of § 1681s-2(b)(1)(C) and (D) of the FCRA – against Citibank

143.    The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

144.    On one or more occasions within the past two years, by example only and without limitation, Citibank violated 15 U.S.C. § 1681s-2(b)(1)(C) and (D) by publishing the Citibank inaccuracies within Plaintiff's credit files with Equifax, Experian, and Trans Union without also including a notation that these debts were disputed and by failing to correctly report results of an accurate investigation to each credit reporting agency.

145.    Specifically, Citibank failed to add the "XB" code to the CCC (Compliance Condition Code) field in the ACDV dispute forms when it responded to Equifax, Experian, and Trans Union.

146.   On information and belief, Plaintiff alleges that Citibank rarely if ever adds the XB code or other notation that an account is disputed when it responds to e-Oscar ACDVs.

48.   Citibank knew that the Plaintiff previously disputed the subject account on multiple occasions directly with Citibank and its agents.

49.   The Plaintiff's disputes were, at a minimum, *bone fide*.

50.   In fact, the Plaintiff's disputes were justified because Plaintiff never opened the disputed loan account and did not owe such a debt to Citibank.

51.   Citibank was aware of the *Saunders v. B.B. & T.* FCRA decision by the Fourth Circuit when it followed the ACDV procedures used regarding the Plaintiff's disputes.

52.   On information and belief, the Plaintiff alleges that the procedures followed regarding the Plaintiff's FCRA disputes through e-Oscar were the procedures that Citibank intended its employees or agents to follow.

53.   On information and belief, the Plaintiff alleges that Citibank's employees or agents did not make a mistake (in the way in which he or she followed Citibank's respective procedures) when he or she received, processed and responded to the Equifax, Experian, and Trans Union's ACDVs and did not include the XB code in the CCC field.

54.   On information and belief, the Plaintiff alleges that Citibank has not materially changed its FCRA investigation procedures regarding the CCC field in ACDVs after learning of their failures in this case.

55. As a result of Citibank's violations of 15 U.S.C. § 1681s-2(b)(1)(C) and (D), the Plaintiff suffered actual damages, including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

56. The violations by Citibank were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, Citibank was negligent, entitling the Plaintiff to recovery under 15 U.S.C. § 1681o.

57. The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Citibank in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o. Plaintiff is not seeking joint liability.

### COUNT V
### <u>Violation of § 1681s-2(b)(1)(E) of the FCRA – against Citibank</u>

147. The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

148. Defendant Citibank violated 15 U.S.C. § 1681s-2(b)(1)(E) by failing to accurately correct and update or delete Plaintiff's information after receiving Plaintiff's disputes from Equifax, Experian, and Trans Union and prior to the commencement of this action. This failure to correct Plaintiff's information resulted from Citibank's respective failure to investigate as articulated herein, after Citibank each received notice of Plaintiff's disputes from Equifax, Experian, and

Trans Union.

149.    As a result of this conduct, action and inaction of Citibank, the Plaintiff suffered damage by loss of credit, loss of the ability to purchase and benefit from a credit, reduction in credit scores, the mental and emotional pain and anguish and the humiliation and embarrassment of having to borrow money and offer explanations for why he lost the ability to benefit from credit.

150.    Citibank's conduct, action and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Plaintiff is not seeking joint liability.

151.    The Plaintiff is entitled to recover his costs and attorneys' fees from Citibank in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT VI
## Violation of § 1681b(f)(1) of the FCRA – against Citibank

152.    The Plaintiff realleges and incorporates the foregoing paragraphs as if fully set out herein.

153.    Defendant Citibank violated 15 U.S.C. § 1681(b)(f)(1) by unlawfully obtaining the Plaintiff's consumer reports from Equifax and Experian without his written authorization or a permissible purpose.

154.    The FCRA's permissible purpose requirements have been in place since 1970. Citibank has therefore had decades to become compliant.

155.    Citibank also has access to court decisions, regulatory advice, and multiple other sources of guidance to advise each entity of the requirements of the FCRA.

156.    Alternatively, Citibank's violations were at least negligent, as it did not have a permissible purpose for using Plaintiff's consumer reports.

157.    As a result of Citibank's conduct, Plaintiff has suffered actual damages in the form of financial and dignitary harm arising from Citibank's review of his personal information and his credit information and injury to his credit rating and reputation.  Furthermore, Plaintiff will continue to continue to suffer the same harm for an indefinite period of time in the future, all to the Plaintiff's great detriment and loss.

158.    Citibank's violation of § 1681(b)(f)(1) of the FCRA, render it liable for actual, statutory and punitive damages, costs and reasonable attorneys' fees.

## JURY DEMAND

159.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for actual, statutory and punitive damages against Defendants; for his attorneys' fees and costs; for prejudgment and postjudgment interest at the judgment rate; specific performance and injunctive relief; and such other relief the Court deems just and proper.

Dated: February 8, 2024                     Respectfully Submitted,

                                            **JUAN FERNANDO TEJADA**

                                            By:*/s/ Craig C. Marchiando*
                                            Craig C. Marchiando
                                            Florida Bar No. 1010769
                                            **CONSUMER LITIGATION
                                            ASSOCIATES, P.C.**
                                            763 J. Clyde Morris Blvd., Suite 1-A
                                            Newport News, VA 23601
                                            Telephone: (757) 930-3660
                                            Facsimile: (757) 930-3662
                                            Email: craig@clalegal.com